## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TIMOTHY S. BARGER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:16cv00011 |
| | ) | |
| **NANCY A. BERRYHILL,**[1] | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Timothy S. Barger, ("Barger"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Barger protectively filed an application for DIB on May 24, 2012, alleging disability as of October 1, 2011,[2] due to problems with his back and knees, "nerves," seizures, high blood pressure and fatigue. (Record, ("R."), at 180-81, 196, 200, 223.) The claim was denied initially and on reconsideration. (R. at 100-02, 106-08, 112-18, 120-22.) Barger then requested a hearing before an ALJ. (R. at 123-24.) The ALJ held a hearing on September 19, 2014, at which Barger was represented by counsel. (R. at 41-72.)

By decision dated November 4, 2014, the ALJ denied Barger's claim. (R. at 25-36.) The ALJ found that Barger met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 27.) The ALJ found that Barger had not engaged in substantial gainful activity since

---

[2] On his application for DIB, Barger alleged an onset date of disability of April 11, 2011. (R. at 180.) However, at his hearing, Barger amended his onset date of disability to October 1, 2011. (R. at 71.)

April 11, 2011, the alleged onset date.[3] (R. at 27.) The ALJ found that the medical evidence established that Barger had severe impairments, namely seizure disorder; lumbago and cervicalgia; history of knee surgery in 1990; obesity; hypertension; anxiety; and depression, but he found that Barger did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27-28.) The ALJ found that Barger had the residual functional capacity to perform simple, routine, repetitive, unskilled, light work[4] that did not require driving or exposure to hazardous machinery, unprotected heights and climbing of ladders, ropes or scaffolds, as well as those that involve more than occasional reaching or exposure to excessive vibration. (R. at 30.) The ALJ found that Barger was unable to perform his past relevant work. (R. at 35.) Based on Barger's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Barger could perform, including jobs as an order clerk and a parking lot attendant. (R. at 35-36.) Thus, the ALJ concluded that Barger was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 36.) *See* 20 C.F.R. § 404.1520(g) (2016).

---

[3] Therefore, Barger must show that he became disabled between April 11, 2011, the alleged onset date, and November 4, 2014, the date of the ALJ's decision. Although Barger amended his alleged onset date of disability to October 1, 2011, (R. at 71), the ALJ found that Barger's alleged onset date was April 11, 2011. (R. at 27.)

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2016).

After the ALJ issued his decision, Barger pursued his administrative appeals, (R. at 17-20), but the Appeals Council denied his request for review.[5] (R. at 8-12.) Barger then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2016). The case is before this court on Barger's motion for summary judgment filed October 27, 2016, and the Commissioner's motion for summary judgment filed November 30, 2016.

## II. Facts

Barger was born in 1968, (R. at 180), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Barger obtained his general education development, ("GED"), diploma and has vocational training in carpentry. (R. at 48, 201.) He has past work experience as a crew chief for a surveying company owned by his father. (R. at 48.) Barger stated that his father closed the business, and he was laid off. (R. at 49.) He stated that he was involved in a motor vehicle accident in 2011 prior to being laid off. (R. at 49-50.) Barger stated that he had experienced three to four seizures a month for the past 15 years. (R. at 50.) Barger stated that none of his medical care providers have asked that his driver's license be revoked. (R. at 52.) He stated that he was not always truthful with his doctors, in that he minimized the number of seizures he had in order to keep his driver's license. (R. at 54.) Barger stated that he attempted

---

[5] On February 24, 2016, Barger's attorney submitted new evidence to the Appeals Council for consideration. (R. at 4-7.) By letter dated May 9, 2016, the Appeals Council stated that it had considered the new evidence submitted and found no reason to reopen Barger's claim. (R. at 1-2.)

to take medication for anxiety and depression, but the medication caused his seizures to worsen and to increase in frequency. (R. at 53-54.) He stated that he could stand and/or walk up to 20 minutes without interruption. (R. at 56.) Barger stated that he needed to change positions from sitting to standing every 15 to 20 minutes due to pain. (R. at 57.) He stated that he would sleep 10 plus hours after having a seizure. (R. at 57.)

Barger's wife, Sherry Barger, also testified at his hearing. (R. at 61-65.) She stated that, over the last six to seven years, Barger experienced three to five seizures a month. (R. at 62.) She stated that Barger would sleep three to four hours following a seizure. (R. at 64.)

Barry Hensley, a vocational expert, was present and testified at Barger's hearing. (R. at 66-70.) Hensley was asked to consider a hypothetical individual of Barger's age, education and work history, who was limited to simple, routine, repetitive, unskilled light work that did not require working around hazardous machinery, unprotected heights or climbing ladders, ropes or scaffolds; that did not require him to drive; and that did not require more than occasional reaching or exposure to excessive vibrations. (R. at 67-68.) Hensley stated that jobs were available existing in significant numbers in the national economy that such an individual could perform, including those of an order clerk and a parking lot attendant. (R. at 68.) Hensley was asked to consider the same individual, but who would be limited as indicated by psychologist B. Wayne Lanthorn's assessment. (R. at 69, 437-39.) He stated that there would be no jobs available that such an

individual could perform.[6] (R. at 69.) Hensley also was asked to consider an individual who would be off task greater than 10 percent of the day on a routine and regular basis as a result of anxiety, pain or seizure activity. (R. at 70.) He stated that there would be no jobs that such an individual could perform. (R. at 70.)

In rendering his decision, the ALJ reviewed records from Wise County Public Schools; Dr. Bert Spetzler, M.D., a state agency physician; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Melinda Wright, F.N.P., a family nurse practitioner; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Crystal Burke, L.C.S.W., a licensed clinical social worker; University of Virginia Health System, ("UVA"); Mountain View Regional Medical Center; Appalachia Family Health; Holston Valley Medical Center; Wellmont Medical Associates, ("Wellmont"); and Jim Werth, Ph.D., a clinical psychologist. Barger's attorney also submitted medical reports from UVA to the Appeals Council.[7]

Barger was diagnosed with a seizure disorder prior to the relevant period and received treatment in the form of medication, mainly Tegretol.[8] (R. at 299.) Barger

---

[6] Based upon the vocational expert's response, the ALJ found that the assessment completed by licensed clinical social worker Crystal Burke was more restrictive than Lanthorn's assessment. (R. at 69, 441-43.) Thus, the ALJ determined that there would be no jobs available should the individual be limited as indicated by Burke's assessment. (R. at 69.)

[7] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 8-12), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[8] In 2007, Barger was diagnosed with a seizure disorder. (R. at 271-74.) At that time,

received treatment for his seizure disorder at UVA. While he was seen by different resident physicians, his attending physician was neurologist Dr. Nathan Fountain, M.D. In August 2010, it was noted that Barger had not been seen since June 2008. (R. at 298-300.) Barger reported that since his last visit, he averaged one seizure per month. (R. at 299.) Barger described these seizures as "a funny feeling" followed by five to 10 seconds of amnesia with no post-event confusion. (R. at 299.) He reported that his seizures occurred during sleep and wakefulness. (R. at 299.) Barger's neurological examination was normal, as it had been in the past. (R. at 299.) It was noted that past neuroimaging and EEGs were normal. (R. at 299.) Barger was instructed not to drive until instructed to do so. (R. at 300.) In October 2010, Barger reported that he had not experienced a seizure since August 2010. (R. at 297.) His neurological examination was unchanged and normal. (R. at 297.) Barger was diagnosed with complex partial seizures due to cryptogenic epilepsy, unclear control, and anxiety, moderately controlled. (R. at 297-98.) He was instructed not to drive. (R. at 297.)

In February 2011, Barger reported that he had not experienced a seizure since August 2010 and that he was doing well on his medications. (R. at 295.) His neurological examination was normal and unchanged. (R. at 295.) It was noted that Barger's epilepsy was well-controlled, and his anxiety was moderately controlled. (R. at 295-96.) In February 2012, Barger reported that he had been seizure-free for 18 months and that he was doing well. (R. at 293.) He reported that his medication did not cause dizziness. (R. at 293.) Barger reported fatigue, but stated that it was

Barger reported having clusters of seizures every three to four weeks. (R. at 274.) On September 5, 2007, and November 21 and 27, 2007, MRIs of Barger's brain were normal as well as EEGs. (R. at 272, 274, 285, 288-90.)

tolerable. (R. at 293.) His neurological examination was normal. (R. at 293.) Barger was diagnosed with cryptogenic localization related epilepsy manifesting as complex partial seizures, well-controlled with medication, and he was scheduled to return in 12 months. (R. at 293-94.)

In January 2013, Barger reported that he had experienced "several seizures" since November 2012.[9] (R. at 331.) He stated that he believed he developed new episodes of seizures after taking Paxil for depression. (R. at 331.) He reported that his seizures manifested with hand automatisms. (R. at 331.) Barger reported difficulty sleeping and fatigue. (R. at 331.) His neurological examination was normal. (R. at 331.) His seizure medication was increased, and a sleep study was recommended. (R. at 332.) Barger was next seen in June 2013, and he reported that he had been experiencing one to two seizures per month. (R. at 410.) He reported that these seizures involved him making chewing movements, blowing motions and having strange and odd behavior. (R. at 410.) Barger reported that he had no recollection of these events. (R. at 410.) Barger reported that, in the past, he had incontinence associated with some seizures, but he had not experienced any incontinence with his recent seizures. (R. at 410.) He also denied any convulsions. (R. at 410.) His neurological examination was normal. (R. at 411.) In October 2013, Barger reported that he had experienced six seizures within the past four months. (R. at 416.) His neurological examination was normal, with the exception of difficulty eliciting his left Achilles. (R. at 416-17.)

---

[9] In November 2012, Barger saw family nurse practitioner, Melinda A. Wright, and reported that he had experienced six to 10 seizures since May 2012, (R. at 341); however, he did not report these seizures to his physicians at UVA. (R. at 331.)

In February 2014, Barger reported that he had been experiencing an average of three staring spell seizures per week with characteristics of a complex partial seizure. (R. at 418.) In September 2014, Dr. Fountain stated that it was his opinion that Barger met the listing for epilepsy, § 11.02. (R. at 452.) In October 2014, Barger reported that he continued to experience two to three seizures per month. (R. at 455.) Dr. Fountain reported that Barger was alert and oriented; he was appropriate in conversation; his pupils were equally round and reactive to light; his extraocular movements and visual fields were full to confrontation; his face was symmetric; his strength was 5/5 throughout with normal tone; his sensation was intact to light touch; his deep tendon reflexes were 2+ and symmetric throughout; and his coordination and gait were normal. (R. at 455.) Dr. Fountain diagnosed complex partial seizures, most likely due to temporal lobe epilepsy, uncontrolled. (R. at 456.)

In February 2015, Barger reported that he experienced three to five seizures per month. (R. at 15.) Dr. Fountain diagnosed complex partial seizures, most likely due to temporal lobe epilepsy, poorly controlled. (R. at 15.) In October 2015, Barger reported that he continued to experience three to five partial seizures per month. (R. at 5-6.) He reported having no adverse side effects to his medications. (R. at 5.) Barger denied significant depression. (R. at 5.) Dr. Fountain reported that Barger was alert and oriented; he was appropriate in conversation; his pupils were equally round and reactive to light; his extraocular movements and visual fields were full to confrontation; his face was symmetric; his strength was 5/5 throughout with normal tone; his sensation was intact to light touch; his deep tendon reflexes were 2+ and symmetric throughout; and his coordination and gait were normal. (R.

at 5.) Dr. Fountain diagnosed complex partial seizures, most likely due to temporal lobe epilepsy, uncontrolled, although he had no worsening in seizure frequency. (R. at 5.)

The record shows that Barger was treated at Wellmont from 2007 through 2014 and was diagnosed with a seizure disorder; hypertension; alcohol abuse; bilateral knee pain; anxiety; gastroesophageal reflux disease, ("GERD"); hyperlipidemia; back pain; dysthymic disorder; and fasciitis. (R. at 275-90, 307-26, 338-43, 360-401.) On May 28, 2010, April Stidham, F.N.P., a family nurse practitioner with Wellmont, saw Barger for complaints of fatigue, anxiety and seizures. (R. at 379.) He reported that he "may have" had two to three seizures, but the time frame of having these seizures was not noted. (R. at 379.) On February 11, 2011, Barger reported that he had not experienced any seizures for six months, and he denied symptoms of anxiety. (R. at 378.) Stidham noted that Barger's anxiety was stable. (R. at 378.) On December 28, 2011, Barger reported that he had not experienced a seizure during the past 11 months. (R. at 307.) He reported that he occasionally consumed alcoholic beverages. (R. at 307.) Dr. Souhail Shamiyeh, M.D., reported that Barger had full range of motion of his head and neck. (R. at 308.)

On May 21, 2012, Barger complained of back pain that radiated into both arms. (R. at 310.) Barger reported that he had sustained "whiplash" from an April 2011 accident that "had resolved." (R. at 310.) Samantha G. Addison, F.N.P., a family nurse practitioner with Wellmont, reported that Barger had full range of motion of his head, neck and upper and lower extremities. (R. at 311.) She reported

that Barger had tenderness in his cervical spine. (R. at 311.) Addison reported that Barger's neurological examination was normal. (R. at 311.) X-rays of Barger's cervical spine were negative. (R. at 314, 326.) In November 2012, Barger reported that he had experienced six to 10 seizures since May 2012. (R. at 341.) Barger complained of anxiety and depression. (R. at 341.) Melinda A. Wright, F.N.P., a family nurse practitioner with Wellmont, reported that Barger had full range of motion of his head and neck with no tenderness. (R. at 342.) She reported that Barger had normal mood and affect, normal judgment and insight and normal thought process and cognitive functioning. (R. at 343.) A neurological examination was normal. (R. at 343.)

In March 2013, Barger reported that he had experienced three seizures since his last visit at UVA.[10] (R. at 338.) Barger complained of anxiety, depression and upper back and neck pain. (R. at 338.) In June 2013, Dr. Shamiyeh reported that Barger had full range of motion in his head and neck with no tenderness. (R. at 360-63.) Neurological examination was normal. (R. at 362.) Dr. Shamiyeh reported that Barger had normal mood and affect, normal judgment and insight and normal thought process and cognitive functioning. (R. at 362.) Although Barger had tenderness in his thoracic spine, he had normal coordination and reflexes. (R. at 362.)

On February 8, 2014, Wright completed a medical assessment, indicating that Barger could lift and carry items weighing less than 10 pounds. (R. at 390-92.)

---

[10] It appears that Barger was seen at UVA on January 9, 2013. (R. at 331.) At that time, he reported that he had experienced "several" seizures since November 2012. (R. at 331.)

She opined that, due to Barger's limitations in his ability to stand and/or walk, he would need to have frequent rests every two hours. (R. at 390.) Wright based this finding on Barger's complaints of back and knee pain. (R. at 390.) She opined that Barger could sit for no longer than two-hour periods and that he could do so for up to 30 minutes without interruption. (R. at 391.) Wright found that Barger could occasionally stoop, kneel, crouch and crawl and never climb or balance. (R. at 391.) She opined that Barger was limited in his ability to reach, to handle, to feel and to push and pull. (R. at 391.) Wright also found that Barger was restricted from working around heights, moving machinery, temperature extremes, chemicals, fumes and vibrations. (R. at 392.) Wright opined that Barger was unable to work. (R. at 392.)

In July 2014, Barger reported that he had experienced a seizure two days prior to his appointment. (R. at 396.) Wright noted that Barger had no visual disturbance, chest pain, cough, nausea, vomiting or diarrhea resulting from the seizures. (R. at 396.) Barger also denied bowel or bladder incontinence while having a seizure. (R. at 396.) He reported that his anxiety was gradually worsening. (R. at 396.) Barger also complained of back and left knee pain, as well as swelling of his left knee. (R. at 396.) Wright reported that Barger had full range of motion of his neck and decreased range of motion with tenderness in both his thoracic and lumbar spine. (R. at 399.) Barger had negative bilateral straight leg raising tests. (R. at 399.) Wright reported that Barger had normal mood and affect and normal behavior and thought content. (R. at 399.) X-rays of Barger's left knee showed osteoarthritis. (R. at 448.) X-rays of Barger's lumbar and thoracic spine showed spondylosis. (R. at 449-50.)

On April 12, 2011, Barger presented to the emergency room at Mountain View Regional Medical Center for complaints of a neck and left shoulder injury following a motor vehicle accident. (R. at 319-25.) X-rays of Barger's cervical spine showed mild spondylosis. (R. at 323.) X-rays of Barger's left shoulder were normal. (R. at 325.) Barger was diagnosed with a sprain/strain to the left shoulder and neck. (R. at 320.)

On August 28, 2012, Dr. Bert Spetzler, M.D., a state agency physician, completed a medical assessment, indicating that Barger had the residual functional capacity to perform medium[11] work. (R. at 78-79.) He opined that Barger could occasionally climb ramps and stairs; frequently balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds. (R. at 78-79.) No manipulative, visual or communicative limitations were noted. (R. at 79.) Dr. Spetzler opined that Barger should avoid moderate exposure to work hazards, such as machinery and heights. (R. at 79.)

On July 22, 2013, Stephen P. Saxby, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Barger had no limitations in his activities of daily living; experienced no difficulties in maintaining social functioning; experienced mild difficulties in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 88-89.)

---

[11] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2016).

On July 22, 2013, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, indicating that Barger had the residual functional capacity to perform light work. (R. at 90-92.) He opined that Barger could occasionally climb ramps and stairs and crawl; frequently balance, stoop, kneel and crouch; and never climb ladders, ropes or scaffolds. (R. at 91.) Dr. Beazley opined that Barger would be limited in his ability to reach with his right arm in all directions. (R. at 91-92.) No visual or communicative limitations were noted. (R. at 92.) Dr. Beazley opined that Barger should avoid concentrated exposure to vibration and moderate exposure to work hazards, such as machinery and heights. (R. at 92.)

On July 7, 2014, Barger saw Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, for complaints of depression. (R. at 394.) Barger reported that he last experienced a seizure five days previously. (R. at 394.) Burke noted that Barger's long- and short-term memory were impaired. (R. at 394.) She reported that Barger had a depressed mood and thought content. (R. at 394.) Burke diagnosed unspecified episodic mood disorder and depressive disorder, not elsewhere classified.[12] (R. at 394.) On September 2, 2014, Barger saw Jim Werth, Ph.D., a clinical psychologist with Appalachia Family Health. (R. at 446.) Barger asked Werth to complete his disability papers; however, Werth stated that he did not feel comfortable doing so. (R. at 446.) Barger reported that he did not want to see a psychiatrist because he did not believe that he could take antidepressant medication. (R. at 446.) Werth diagnosed unspecified episodic

---

[12] On July 8, 2014, Barger saw Wright for complaints of anxiety and depression; however, Wright reported that Barger was normal on psychiatric examination. (R. at 396, 399.)

mood disorder and depressive disorder, not elsewhere classified. (R. at 446.) On September 15, 2014, Barger reported depression, anxiety, pain and restless sleep. (R. at 445.) He reported that he had experienced four seizures in the past four days. (R. at 445.) Barger also reported difficulty with short-term memory and poor concentration. (R. at 445.) Burke reported that Barger's hygiene and grooming were fair and that he had problems with concentration and with initiating conversation. (R. at 445.) That same day, Burke completed a mental assessment, indicating that Barger had moderate[13] limitations in his ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 441-43.) She opined that Barger had marked[14] limitations in his ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; and to demonstrate reliability. (R. at 441-42.) Burke found that Barger had extreme[15] limitations in his ability to follow work rules; to deal with work stresses; to function independently; to maintain attention/concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 441-42.) She opined that Barger would be absent from work more than two days a month as a result of his impairments. (R. at 443.)

On August 23, 2014, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Barger at the request of Barger's attorney. (R. at 425-35.)

[13] Moderate limitation is defined as more than a slight limitation, but the individual is able to function satisfactorily. (R. at 441.)

[14] Marked limitation is defined as a substantial loss in the ability to effectively function – resulting in unsatisfactory work performance. (R. at 441.)

[15] Extreme limitation is defined as no useful ability to function. (R. at 441.)

The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Barger obtained a full-scale IQ score of 81. (R. at 426.) Lanthorn administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), which indicated that Barger's depressive state directly contributed to social withdrawal, the probability of poor concentration and difficulty meeting his responsibilities. (R. at 431-33.) Barger reported that he had not consumed alcoholic beverages for the past "one to two months." (R. at 428.) He stated that he had a history of having blackouts when he consumed alcoholic beverages. (R. at 428.) Lanthorn noted that Barger walked without apparent difficulties; his grooming and hygiene were good; his speech was clear and intelligible; and he displayed no clinical signs or indications of ongoing psychotic processes or delusional thinking. (R. at 429.) Barger reported that he struggled with short-term memory loss on a frequent basis. (R. at 429-30.) Lanthorn reported that Barger presented in a very flat and blunt manner. (R. at 430.) He reported that Barger was capable of persisting at tasks and exercising appropriate concentration. (R. at 430.) Lanthorn diagnosed major depressive disorder, recurrent, moderate, and generalized anxiety disorder. (R. at 433.)

On September 8, 2014, Lanthorn completed a mental assessment, indicating that Barger had mild[16] limitations in his ability to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 437-39.) He opined that Barger had moderate limitations in his ability to follow work rules; to function independently; to understand, remember and carry out detailed job

---

[16] Mild is defined as a slight limitation, but the individual can generally function well. (R. at 437.)

instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 437-38.) Lanthorn found that Barger had marked limitations in his ability to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to maintain attention/concentration; and to understand, remember and carry out complex job instructions. (R. at 437-38.) He opined that Barger would be absent from work more than two days a month as a result of his impairments. (R. at 439.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2016); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2016).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Barger argues that the ALJ's residual functional capacity assessment is not based on substantial evidence of record. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Barger argues that the ALJ erred by failing to properly weigh the medical evidence of record. (Plaintiff's Brief at 5-7.) Barger also argues that the ALJ erred by failing to find that his impairment met or equaled the listing for epilepsy found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02. (Plaintiff's Brief at 7.)

Barger argues that the ALJ erred by failing to properly weigh the medical evidence of record. (Plaintiff's Brief at 5-7.) In particular, Barger argues that the ALJ should have given the opinions of Wright, Lanthorn and Burke controlling weight. (Plaintiff's Brief at 5-7.) It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Barger contends that the ALJ did not adequately address the opinions of Wright, Lanthorn and Burke. (Plaintiff's Brief at 5-7.) The ALJ found that Barger had the residual functional capacity to perform simple, routine, repetitive, unskilled light work that did not require driving or exposure to hazardous machinery, unprotected heights and climbing of ladders, ropes or scaffolds, as well as those that involve more than occasional reaching or exposure to excessive vibration. (R. at 30.) In reaching this conclusion, the ALJ stated that he was giving "little weight" to the assessments of Wright, Lanthorn and Burke. (R. at 34-35.)

Regarding Barger's physical residual functional capacity, the ALJ said that he gave little weight to Wright's assessment because it was not supported by the minimal clinical findings and conservative treatment. (R. at 35.) A review of the record, however, shows that the two state agency physicians placed additional restrictions on Barger's work-related abilities. (R. at 78-79, 90-92.) Dr. Spetzler opined that Barger could only occasionally climb ramps and stairs. (R. at 78-79.) Dr. Beazley opined that Barger could only occasionally climb ramps and stairs and crawl. (R. at 90-92.) The ALJ's opinion did not address these additional restrictions found by the state agency physicians.

Regarding Barger's mental residual functional capacity, the ALJ noted that he was giving the opinion of Lanthorn "little weight" because it was based on a one-time evaluation and because it was not supported by Lanthorn's own clinical findings. (R. at 34.) The ALJ stated that he was giving Burke's opinion "little weight" because she saw Barger on only two occasions and because she did not record any objective clinical findings to support her assessment. (R. at 34-35.) The record shows that Barger was diagnosed with anxiety in 2010. (R. at 297-98.)

While the record shows that Barger's anxiety was controlled and stable through 2013, he reported in July 2014 that his anxiety was worsening. (R. at 297-98, 378, 396.) In 2013, Barger attempted to take antidepressant medication, but could not do so because he developed an increase in seizure activity while on the medication. (R. at 331.)

On July 7, 2014, Burke noted that Barger had impairments in his long- and short-term memory. (R. at 394.) Burke diagnosed unspecified episodic mood disorder and depressive disorder, not elsewhere classified. (R. at 394.) Burke based her diagnosis on Barger's symptoms of depression; anxiety; disturbing thoughts or feelings; change in sleep pattern; difficulty in focusing; and moodiness. (R. at 394.) In August 2014, Lanthorn reported that Barger was capable of persisting at tasks and exercising appropriate concentration; however, in September 2014, Burke noted that Barger had problems with concentration and with initiating conversation. (R. at 445.) While there are inconsistencies in Lanthorn's clinical findings and his assessment, I note that there are similarities between Burke and Lanthorn's mental assessments. (R. at 437-39, 441-43.) For example, both found that Barger had an unsatisfactory ability to relate to co-workers, to deal with the public and to interact with supervisors. (R. at 437, 441.) Barger reported that he preferred to be alone and that he did not like to interact with other people. (R. at 429, 446.)

The MMPI-2 indicated that Barger's depressive state directly contributed to social withdrawal, the probability of poor concentration and difficulty meeting his responsibilities. (R. at 431-33.) Lanthorn noted that Barger chewed his fingernails as a result of his anxiety. (R. at 433.) Burke also noted that Barger "bites [his]

fingernails into the quick." (R. at 394.) These assessments are the only two mental assessments contained in the record. I also note that these assessments were performed more than a year after the state agency psychologist completed the PRTF. (R. at 88-89.) In his PRTF, the state agency psychologist stated that Barger had mild difficulties in maintaining concentration, persistence or pace. (R. at 89.) The ALJ did not address the state agency psychologist's finding in his opinion.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

A review of the ALJ's decision shows that the ALJ failed to mention the state agency experts' findings and what weight, if any, he was giving to them. Furthermore, the limitations posed to the vocational expert were that the individual not be required to work around hazardous machinery or unprotected heights; that

he not be required to climb ladders, ropes or scaffolds; that did not require him to drive; and that did not require more than occasional reaching or more than occasional exposure to excessive vibrations. (R. at 67-68.) Based on this, I find that the ALJ failed to properly analyze the evidence and sufficiently explain what weight, if any, he was giving to the opinions of the state agency medical experts. Thus, I do not find that substantial evidence exists to support the ALJ's finding with regard to Barger's residual functional capacity.

Barger also argues that the ALJ erred by failing to find that his impairments met or equaled the listing for epilepsy, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02. (Plaintiff's Brief at 7.) Section 11.02 requires that the disorder be documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least three months of prescribed treatment. With:

A. Daytime episodes (loss of consciousness and convulsive seizures) or
B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding that Barger's epilepsy did not meet or equal §11.02. The ALJ acknowledged Dr. Fountain's statement, wherein he found that Barger met or equaled the listing of impairment for epilepsy found at § 11.02. (R. at 29, 452.) The ALJ noted that there was no evidence in the record that Barger had seizures that occurred at least once a month. (R. at 29.) I do not agree with this finding. The record shows that Barger repeatedly complained of experiencing multiple seizures on a monthly basis since November 2012. (R. at 5, 15, 331, 341, 410, 416, 418.)

The record shows that Barger's neurological examinations were repeatedly normal. (R. at 5, 293, 295, 297, 299, 311, 331, 343, 362, 411, 416-17, 455.) In addition, neuroimaging and EEGs were normal. (R. at 272, 274, 285, 288-90, 299.) Despite the frequency of Barger's seizures, § 11.02 contemplates "grand mal" seizures – episodes involving a loss of consciousness or convulsions. Based on Barger's medical records and his wife's testimony, Barger did not experience these types of seizures. (R. at 63, 410, 416, 418, 455.) The record shows a diagnosis of "complex partial seizures." (R. at 5, 15, 293-94, 297, 418, 456.) Barger reported to Dr. Fountain that he had no convulsions in his episodes and did not report a loss of consciousness. (R. at 410, 416.) Likewise, Barger's wife did not describe convulsions or loss of consciousness. (R. at 63.) Thus, I find that substantial evidence exists to support the ALJ's finding that Barger did not meet or equal the listing for epilepsy.

Based on the above, I find that substantial evidence does not exist in the record to support the ALJ's finding that Barger was not disabled. An appropriate Order and Judgment will be entered remanding Barger's claim to the Commissioner for further development.

ENTERED: September 18, 2017.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE